IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DEANDRE T. CLARK, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PX-21-0382 |
| WEXFORD HEALTH SOURCE INC., *et al.*, | * | |
| Defendants. | * | |

\*\*\*

**<u>MEMORANDUM OPINION</u>**

DeAndre T. Clark, an inmate at Western Correctional Institution (WCI), has filed suit pursuant to 42 U.S.C. § 1983, alleging delay and denial of medical care causing unnecessary pain and suffering in violation of the Eighth Amendment to the United States Constitution. ECF No. 1. Clark's medical difficulties span four and half years and two groups of providers: Defendants Wexford Health Source Inc. ("Wexford") and Corizon Health, Inc. ("Corizon"), and physicians Dr. Rebustiano Barrera, Dr. Ava Joubert-Curtis, and Dr. Asresahegn Getachew. All Defendants have moved to dismiss the claims or alternatively for summary judgment in their favor. ECF Nos. 21, 33. The Court has reviewed the pleadings and will resolve the motions without a hearing. Local Rule 105.6 (D. Md. 2021). For the reasons stated below, Defendants' Motions to Dismiss, or in the Alternative Summary Judgement, are GRANTED in part and DENIED in part.

I.   **Background**

The parties submit record evidence beyond the four corners of the Complaint. Accordingly, the Court treats the motions as one for summary judgment and construes all evidence most favorably to Clark.

In June of 2017, Clark hurt his right knee playing basketball. ECF No. 1 at 5. He was evaluated at Western Maryland Health System and diagnosed with an acute inferior patella tendon rupture. ECF No. 33-2 at 80-84. That same day, Clark was discharged to WCI with a knee immobilizer and a recommendation for follow-up evaluation for "likely surgical repair." *Id.* at 83.

After one day in the WCI infirmary, Clark returned to general population. *Id.* at 5. He could move with the assistance of a walker, but was also given crutches, a wheelchair for long distances, Tylenol and Toradol[2] for pain, and orders for an "urgent" orthopedist consultation. *Id.* The next day, a WCI physician completed the referral to the prison's "utilization review" medical team for an orthopedic consult (hereafter "utilization review"). *Id.* at 77. Despite Clark's discharge instruction, utilization review declined the request for an orthopedic evaluation and instead recommended physical therapy and a follow up evaluation in two months. ECF No. 33-3 at 3; *see also* ECF No. 33-2 at 78 (recommendation entered in medical records by Dr. Joubert-Curtis).

A week later, on June 19, 2017, Clark attended a follow up medical appointment at WCI. ECF No. 33-2 at 6-7. Clark could walk slowly while wearing the knee immobilizer and using crutches, but needed the wheelchair for long distances. *Id.* at 6. His knee was swollen, and he was in severe pain. *Id.* at 7. On June 27, 2017, Clark returned to the medical unit. *Id.* at 8-9. Clark was still in pain, and he asked about scheduling the surgery that he had been told he needed. *Id.* at 8. Clark's treatment plan at the time included a referral to a "provider to determine time for surgery." *Id.*

---

[2] Toradol (ketorolac tromethamine) is only indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. *See* https://www.pdr.net/drug-summary/Ketorolac-Tromethamine-Tablets-ketorolac-tromethamine-1793.3935.

On July 8, 2017, Clark saw a nurse for a scheduled visit where he complained of worsening pain and instability. *Id.* at 10-11. The nurse requested that Clark be evaluated by on-site orthopedic physician, Dr. Roy Carls, and that Clark receive stronger pain medication. *Id.* at 12 (prescription naprosyn[3] and the addition of tramadol[4] for "acute pain."). Now with a second referral for an orthopedic consult, "utilization review" again declined to authorize it. ECF No. 33-3 at 4. Instead, the team deferred the consult so that Clark could complete a month of physical therapy. *Id.*

Clark did not receive an evaluation for physical therapy until August 4, 2017. *Id.* at 3; ECF No. 33-2 at 106. He was given five sessions. *Id.* Three weeks later, on August 21, 2017, Clark attended a sick call with another WCI nurse. ECF No. 33-2 at 13-14. He was experiencing a constant throbbing pain in his knee and he could not bend his leg. He asked for more pain medication. He still needed a knee brace and one crutch to walk, and he now had a limp. *Id.* at 13.

By the next month, Clark saw some improvement in his knee. At a follow up physical therapy evaluation, Clark received six additional sessions a referral for an orthopedic consult. *Id.* at 107. Regrettably, twelve days after that visit, Clark reported "severe" pain and limited ability to move around his cell with crutches. *Id.* at 15. Clark asked again why he had not yet received scheduled surgery to repair his ruptured tendon. A nurse submitted yet another request for an

---

[3] Naproxen (naprosyn) is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain. *See* https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820.

[4] Tramadol is used to relieve moderate to moderately severe pain, including pain after surgery. The extended-release capsules or tablets are used for chronic ongoing pain. Tramadol belongs to the group of medicines called opioid analgesics. It acts in the central nervous system (CNS) to relieve pain. *See* https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050.

orthopedic consult, and Dr. Curtis-Joubert approved Clark for an additional 30 days of pain medication. *Id.* at 17-18.

Eleven days later, Clark returned to medical in a wheelchair for a sick call. ECF No. 33-2 at 19. He had pain below his kneecap and could not bend his knee. His leg was swollen from his thigh to his calf. The nurse practitioner recommended that the Regional Medical Director examine Clark and in the interim, and that he should apply ice to his knee for the swelling and follow the directives of the physical therapist. Clark's pain medication was increased, now to Tylenol #3 with codeine.[5]

Clark returned to medical for a scheduled visit on October 20, 2017. He asked again when he would receive the recommended orthopedic consult. *Id.* at 20. Clark was told no consult had been generated but that he would be placed on the orthopedics roster that day. On October 26, 2017, utilization review approved the consult. Clark was not seen by a specialist until nearly four months later, in February 2018. ECF No. 33-3 at 4; 33-2 at 85.

In the meantime, Clark had four separate medical visits where he could not walk unassisted; he was in pain and had limited range of motion. ECF No. 33-2 at 21 (Nov. 2, 2017 visit); *id.* at 22-23 (Nov. 4, 2017 visit); *id.* at 25-26 (Dec. 30, 2017 visit); *id.* at 28-29 (Feb. 2, 2018 visit). At each visit, Clark asked when he would receive his consult. In fact, Dr. Joubert-Curtis noted in December 2017 that such visit should be scheduled "ASAP due to delay." *Id.* 25-26.

On February 22, 2018, orthopedic specialist Dr. Carls evaluated Clark. ECF No. 33-2 at 85. Clark was using a cane and sleeve knee brace and exhibited "obvious[] . . . pain and weakness."

---

[5] Tylenol #3 is a combination of Acetaminophen and codeine used to relieve mild to moderate pain. *See* https://www.mayoclinic.org/drugs-supplements/acetaminophen-and-codeine-oral-route/side-effects/drg 20074117?p=1.

*Id.* Physical examination revealed that Clark had "obviously patella alta," which is where the kneecap sits higher than normal on the thigh bone. This makes the knee less stable and prone to dislocation and pain.[6] Dr. Carls ultimately diagnosed Clark with a "chronic patellar tendon rupture in a young, otherwise, active and healthy patient." *Id.* Dr. Carls recommended that Clark receive patellar tendon reconstruction surgery to be performed by a surgeon specializing in the procedure because "at this point in time, this is beyond just a simple repair and that he will need a reconstruction using graft material to reconstruct this patellar tendon." *Id.*

Nearly a month later, on March 3, 2018, Clark attended a scheduled medical visit with a nurse practitioner to review his orthopedic consultation. *Id.* at 30-31. The nurse practitioner placed a referral for a "priority" consultation and requested renewal of Clark's pain medication. *Id.* at 30. Dr. Getachew approved the renewal of medication and noted that Clark was awaiting surgery for a patella tendon rupture. *Id.* at 32.

On March 8, 2018, utilization review approved another orthopedic evaluation with Dr. Ashkok Krishnaswamy, an orthopedic surgeon at Bon Secours Hospital, to verify that the treatment needed was within his "scope of practice." ECF No. 33-3 at 4. On April 11, 2018, Clark was evaluated by Dr. Krishnaswamy. ECF No. 33-2 at 86-87. The doctor noted after examination that not only did Clark experience restricted movement, swelling and pain, Clark now had quadricep weakness. *Id.* at 86-87. Dr. Krishnaswamy recommended Clark for an MRI "soon," and in the interim, that Clark use the knee brace and refrain from athletic activity. *Id.* at 86.

Three weeks later, on May 2, 2018, utilization review decided that Clark should receive an orthopedic evaluation at the University of Maryland Medical System because Clark now required

---

[6] *See* https://www.knee-pain-explained.com/patella-alta.html.

complex reconstructive surgery with grafting of the patellar tendon. ECF No. 33-3 at 5. But more than a month went by before Clark even received his MRI. ECF No. 33-2 at 131-132. And then, he waited nearly three more months, until September 2018, for his evaluation. In the meantime, Clark was seen for deep and sharp knee pain, instability, stiffness, swelling and tenderness. *Id.* at 33-34.

Clark received his follow up evaluation on September 5, 2018, at the University of Maryland Shock-Trauma Orthopedic Clinic. ECF No. 33-2 at 88. But that evaluation went nowhere because he had been sent to the wrong clinic. *Id.* at 37. Utilization review then had to reissue the referral. ECF No. 33-3 at 5. Meanwhile, Clark continued to struggle with pain, limited mobility, and instability. ECF No. 33-2 at 37-39.

Two more months went by before Clark was seen by a physician assistant at the Johns Hopkins Orthopedics Clinic on November 20. *Id.* at 89-91. He had an "antalgic gait"[7] but no significant patella alta or tilt, he could not perform single leg squats, and he suffered noticeable weakness during straight leg raises. He also had moderate quadriceps atrophy. *Id.* at 90. Because of the weakness in Clark's surrounding muscles, the physical assistant recommended that Clark receive another round of physical therapy prior to surgery to improve surgical outcomes. *Id.* at 91. Johns Hopkins also requested that WCI forward Clark's MRI scans to the clinic. *Id.* at 40.

As of January 1, 2019 –18 months after Clark's injury – Wexford lost the medical contract to Corizon. ECF No. 33-3 at 1; ECF No. 21-1 at 1 n.1. Drs. Getachew and Joubert-Curtis evidently remained at WCI and now worked with Corizon. Corizon implemented largely the same

---

[7] An antalgic gait is a disruption in a person's walking pattern that's usually caused by pain. In an antalgic gait, the phase when you stand is shorter than when you swing the other leg forward to take the next step. This causes you to walk unevenly. *See* https://www.healthline.com/health/antalgic-gait.

6

procedures for administration of medical care as did Wexford, including utilization review.  ECF Nos. 21-2 at 1; 21-31 at 3; 33-2 at 74.

On February 19, 2019 Clark returned to Johns Hopkins for a follow up visit.  *Id.* at 92-94.  Clark reported that he had not received the prescribed physical therapy, but he was exercising on his own.  *Id.* at 92.  Clark also learned that medical never sent his MRI scans to Johns Hopkins.  *Id.* at 45.

On March 7, 2019, Clark was recertified for physical therapy, which he completed by May 9.  *Id.* at 108-118.  During this time, his Tramadol prescription to alleviate his pain was renewed.  *Id.* at 46-48. Dr. Getachew personally approved the renewal for 90 days, noting Cark needs physical therapy prior to surgery and the prescription was for "SHORT TERM ONLY," and "until surgery" for his "partial patella tendon rupture."  *Id.* at 49-50.

Clark did not receive the surgery in the following 90 days.  Rather, for the next two years, Clark found himself in a revolving door of sick calls, evaluations, and trips to the WCI medical unit.  Among the dozens of medical visits over this period, Clark returned to the Johns Hopkins clinic.  He reported that his knee continued to buckle, grind, give way, and that he was not receiving any physical therapy.  *Id.* at 95-99, 100-102, 103-05.  In late 2019, Johns Hopkins performed a second MRI on Clark's knee, which showed the patella tendon rupture had "healed."  ECF No. 31-2 at 103.  However, Clark still complained of weakness, his knee giving out, and difficulty moving.  He was also told that his surgery may be less "complicated" than before, but no surgery was scheduled.  ECF No. 21-31 at 2.  He instead received more physical therapy until Covid-19 paused all sessions. ECF No. 33-2 at 65, 119, 121-128.

On September 1, 2020, Clark was seen for a physical therapy recertification.  He was in pain, needed a cane and knee sleeve, and experienced ongoing instability and weakness.  *Id.* at

129. Clark received no further therapy, however because according to the therapist, he had reached "optimum" benefit. *Id.* Yet as of February 4, 2021, Clark still could not walk unassisted and complained of chronic pain. *Id.* at 69-70. Likewise, at a medical visit on May 25, 2021, Clark showed up using his cane, he had limited range of motion and muscle weakness, and he complained that now his back hurt alongside his knee. *Id.* at 74-75. He was given more pain medication, again approved by Dr. Getachew, and told that any future orthopedic consultations would be deferred in favor of a more conservative treatment plan. *Id.* at 76.

On December 21, 2021, four and a half years after his injury, Clark filed suit, alleging that Defendants' delay and denial of necessary knee surgery caused him needless pain and suffering, in violation of his Eighth Amendment right to be free from cruel and unusual punishment.[8] The Defendants have timely moved for dismissal or judgment in their favor, essentially alleging that the record viewed most favorably to them cannot satisfy an Eighth Amendment claim as a matter of law. The Court considers arguments of the individual physicians first and then turns to the institutions.

## II.     Standard of Review

Defendants move to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment to be granted in their favor. Such motions implicate the court's discretion under Rule 12(d). *See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012). Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the court,

---

[8] Clark also separately alleges a violation of his Fourteenth Amendment rights, but as a prisoner serving a sentence, the claim lies only in the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *cf. City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 243–44 (1983) (Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment).

the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The court maintains "'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" *Wells-Bey v. Kopp*, No. ELH-12-2319, 2013 WL 1700927, at *5 (D. Md. Apr. 16, 2013) (quoting 5C Wright & Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

Clark was placed on notice that Defendants sought summary judgment and responded in opposition. ECF Nos. 22, 32-34. Accordingly, the Court treats the motions as ones for summary judgment. *See, e.g., Moret v. Harvey*, 381 F. Supp. 2d 458, 464 (D. Md. 2005). Pursuant to Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

### III.   Analysis

Clark's alleged denial of medical care implicates his Eighth Amendment right to be free from "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To succeed in the claim, Clark must demonstrate that each defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (describing the applicable standard as an "exacting"). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d at 219, 225 (4th Cir. 2016). Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)).

Deliberate indifference specifically requires the plaintiff to show that objectively, he was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (internal quotation marks and ellipses omitted).

Proof of an objectively serious medical condition, however, does not end the inquiry. The plaintiff must also demonstrate that defendant's exhibited "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson*, 775 F.3d at 179. That said, "negligence or malpractice on the part of. . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Adequacy of treatment in this context "is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977).

Relevant here, this Court has consistently held that deferral of surgery in favor of conservative treatment alone does not amount to deliberate indifference. *See Dyson v. Wexford Health Sources, Inc.*, No. TDC-19-0307, 2020 WL 1158791, at *7 (Mar. 10, 2020), *aff'd*, 2021 WL 5357490 (4th Cir. 2021); *Rivera v. Wexford Health Sources, Inc.*, No. DKC-17-666, 2018 WL

11

2431897, at * 4 (May 30, 2018); *Dent v. Wexford Health Sources, Inc.*, No. CBB-15-206, 2017 WL 930126, at *8 (D. Md. 2017), *aff'd sub nom, Dent v. Ottey*, 698 F. App'x 99 (Mem) (4th Cir. 2017); *Jennings v. Ottey*, No. WMN-14-1736, 2015 WL 4496431, at *5 (July 22, 2015), appeal dismissed, No. 15-7194 (4th Cir.).  However, delay of treatment in the face of significant pain is the kind of harm sufficient to support a finding of deliberate indifference. *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 733–34 (Mem) (4th Cir. 2015); *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (collecting cases).

It is undisputed that Clark suffered from a serious medical need.  The parties instead focus on whether the record, viewed most favorably to Clark, could support a finding of deliberate indifference in response to his needs. The Court first addresses the individual Defendants and then turns to Corizon and Wexford.

### A.  Dr. Robustiano Barrera

Clark's liability theory as to Dr. Barrera is that he occupied the position of "primary physician" for Wexford "who held the authority as lead supervisor physician" at WCI.  ECF No. 1 at 4.  Nothing in the medical records reflect that Dr. Barrera had any contact with Clark, and in fact, Dr. Barrera no longer worked with Wexford after July 27, 2017, about six weeks after Clark was injured.  ECF No. 33-4 at 2.   Nor does Dr. Barrera's single prescription of Tramadol issued to Clark shortly after his injury reflect any delay or denial of medical care, and certainly not with deliberate indifference.  *Id.*  Accordingly, the Court grants summary judgment in favor of Dr. Barrera.

### B.  Dr. Asresahegn Getachew

Dr. Getachew compels a different outcome.  Dr. Getachew submits that because he never "examined" Clark, that he could not have denied necessary medical care with deliberate

indifference. ECF No. 21-2 at 47. Dr. Getachew has been involved in a supervisory capacity with Wexford and Corizon for the entirety of Clark's course of care. For the first two years, Dr. Getachew had been in close consultation with utilization review to provide Clark "conservative" treatment in lieu of surgery. ECF No. 33-3 at 3-4, 6. These decisions were made with Dr. Getachew's input, and in the face of several recommendations of specialists for surgery. Dr. Getachew was also acutely aware of Clark's pain and suffering; in 2019, he prescribed Clark strong pain medication to be taken only on a short term basis pending Clark's surgery Johns Hopkins. ECF No. 33-2 at 49. And yet, Clark never received the surgery during Dr. Getachew's tenure. At this stage of the proceedings, the record viewed most favorably to Clark demonstrates that Dr. Getachew knew quite well the nature and severity of Clark's knee injury even if he never "physically examined" the man. ECF No. 33-2 at 24, 27, 32, 35.

Likewise, Dr. Getachew had been involved in delaying and denying Clark's surgery for over four years. Dr. Getachew knew that specialists -- from the onset of injury in 2017 -- had recommended surgery. ECF No. 33-2 at 88, 37-38, 89-91. Dr. Getachew appears on several medical records as a "provider" or "ordering physician," Clark toggled back and forth between evaluations, physical therapy, medications, assistive devices. *E.g.,* ECF No. 21-6 at 1; ECF No. 21-14 at 3; ECF No. 33-2 at 39, 71, 76, 122, 125-128, 135. As Clark's condition deteriorated, Dr. Getachew responded most directly with more pain medication and an occasional assistive device. At this stage, a genuine dispute of fact exists as to whether Dr. Getachew was deliberately indifferent to Clark's serious medical needs in violation of his Eighth Amendment rights. Summary judgment absent discovery is denied as to Dr. Getachew.

### C. Dr. Joubert-Curtis

Dr. Joubert-Curtis worked for Wexford in 2017 and 2018 during which time she was briefly Medical Director at WCI. ECF No. 21-31 at 1. Dr. Joubert-Curtis admits that she approved Tramadol for Clark in September of 2017, *id.* at 3, and so was clearly aware of the nature and severity of his knee injury. The doctor also maintains that she only "recorded" utilization review's denial of an orthopedic consult immediately following his injury, but given her level of responsibility at WCI, Clark is entitled to explore whether she had any further involvement in deciding Clark's course of care during this time. *Id.* Discovery as to the nature of Dr. Joubert-Curtis' involvement seems especially necessary when considering that she noted the medical necessity of the prescription given the nature of his injury, and while he awaited an orthopedic consult. ECF No. 33-2 at 18. When the consult did not take place, it was Dr. Joubert-Curtis who was notified directly that Clark needed "an ortho visit ASAP due to delay." ECF No. 33-2 at 25. This alone suggests that Dr. Joubert-Curtis had more direct involvement with Clark's care than she avers. Discovery is necessary to ascertain her involvement in the protracted delay in Clark's orthopedic referrals. The motion as to Dr. Joubert-Curtis is therefore denied.

### D. Wexford and Corizon

Both Wexford and Corizon argue that each is entitled to summary judgment because the record fails to establish anything more than mere supervisory liability, which is legally unavailable for § 1983 claims. *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983). Where a private corporation performs functions otherwise reserved for a state actor, it may be held liable for carrying out those functions pursuant to a "custom, policy, or practice" that "violate[s] a plaintiff's constitutional rights." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014); *see Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978); *see also Haughie*

14

*v. Wexford Health Sources, Inc.*, No. ELH-18-3963, 2020 WL 1158568, at *15 (D. Md. Mar. 9, 2020) (*citing Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003). Accordingly, claims against Wexford or Corizon may only proceed if record evidence supports that "its policy or custom . . . is (1) fairly attributable to the [corporation] as its 'own,' . . . and is (2) the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1386–87 (4th Cir. 1987) (citation omitted). The claim thus survives if "certain affirmative decisions of [the corporation's] individual policymaking officials, or [] certain omissions on the part of policymaking officials [] manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *see also Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

At this stage in the proceedings, the § 1983 claim against Wexford and Corizon necessitates further exploration. The individual Defendants, Drs. Getachew and Joubert-Curtis, both occupied supervisory positions at the time they participated in Clark's care. They further reference and rely on an institutional mechanism -- utilization review -- whereby collective decisions are made concerning the care provided to inmates, and in Clark's case appear to have run contrary to the recommendations of consulting specialists. More to the point, the record permits the inference that a preexisting organizational decision-making process contributed to the delay or denial of Clark's orthopedic consults and of recommended surgery despite the inmate's obvious pain and deteriorating physical condition. Clark ought to have opportunity to explore whether such processes amount to an unconstitutional policy, custom, or practice resulting in delay or denial of necessary medical care with deliberate indifference. The Court will appoint pro bono counsel to assist him going forward. The motions as to Corizon and Wexford are therefore denied.[9]

---

[9] The Court also denies Clark's motion for default judgment against Wexford. ECF No 35. Contrary to Clark's representation, Wexford did file a timely response to the motion, and in any event, Wexford has sufficiently

15

**IV.     Conclusion**

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. All claims against all Defendants will proceed except those against Dr. Barrera. The Court will appoint pro bono counsel to represent Clark. A separate Order follows.

Date: 2/28/22                                                                             /S/
                                                                                    Paula Xinis
                                                                                    United States District Judge

---

participated in the litigation to bring about a timely resolution of this matter on the merits. *See* Fed. R. Civ. P. 55.